639 A.2d 893

**GEORGE CLAY STEAM FIRE ENGINE AND HOSE COMPANY, Petitioner,**

**v.**

**PENNSYLVANIA HUMAN RELATIONS COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 7, 1993.

Decided March 10, 1994.

470

Donald J. Martin, for petitioner.

Pamela Darville, Asst. Chief Counsel, for respondent.

Before CRAIG, President Judge, SMITH, J., and KELTON, Senior Judge.

CRAIG, President Judge.

The George Clay Steam Fire Engine and Hose Company (the petitioner, hereinafter referred to as the "company") appeals to this court from a decision and order of the Human Relations Commission that found the company in violation of the Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951–962.2 (the Act). The company asks that this court reverse the decision of the commission because the hearing examiner committed errors of law and fact. In addition, the company argues that the commission's enabling legislation unconstitutionally mandates commingling of prosecutorial and adjudicatory functions. We disagree with the company and affirm the decision of the commission.

## HISTORY

The facts as found by the hearing examiner are as follows. The company operates under a constitution and by-laws that include four types of membership: active members (who are the only members required to answer all alarms), honorary members, life members (awarded for meritorious service) and contributing members. Contributing members do not have to answer alarms, but donate money and services to the company. In addition to the "company" itself, there are also four interrelated associations that are governed by separate consti-

tutions including the "Active Association" [1], the George Clay Ladies Auxiliary, the George Clay Ambulance Corps, and the George Clay Fireman's Relief Association.

Martha Kenna, one of the complainants here, joined the Ambulance Corps in 1979. Kenna works as a bank teller, and she is an emergency medical technician (EMT) instructor and CPR instructor. In addition, she is trained in vehicle rescue, basic and special vehicle rescue, and Rescue I and II.

The complainant Marianne Hanna also joined the Ambulance Corps in 1979. Later that year she also joined the Ladies Auxiliary. Hanna is a registered nurse and works in a pre-surgery ward of a hospital. She has training in CPR and is an EMT.

Jacqueline Carracappa–Waddell, another complainant here, joined the Ambulance Corps in 1986 or 1987. She is a homemaker and works part-time at a business called Kiddie City. She has training in CPR and advanced first aid.

The last complainant here, Carol Brigandi, is an EMT and worked with the Ambulance Corps for an unspecified time period, ranging from two to ten years at the time the complainants brought this complaint.

In 1988, the complainants applied for contributing-member status in the company (the first application). The complainants were the first women to apply for membership in the company. The reason that the complainants wanted to join

1. The "Active Association" is an organization distinct from the "company" and its "active members". The Active Association Constitution lists the criteria for membership eligibility as follows:
    (a) ALL COMPANY, AMBULANCE AND ACTIVE OFFICERS.
    (b) FIREMEN WHO HAVE MADE AT LEAST 20% OF ALL ALARMS DURING THE PAST YEAR.
    (c) FIRE COMPANY MEMBERS WHO HAVE *ACTIVELY* SERVED ON AT LEAST THREE COMMITTEES DURING THE PAST YEAR.
    (d) PRESENT ACTIVE MEMBERS WHO HAVE HAD TEN YEARS OF CONTINUOUS MEMBERSHIP IN THE ACTIVE ASSOCIATION.
    (e) AMBULANCE PERSONNEL SHALL BE JUDGED ACTIVE SOLELY ON THE RECOMMENDATION OF THE MEMBERSHIP COMMITTEE.
    (f) THE MAYOR OF THE BOROUGH SHALL BE AFFORDED HONORARY MEMBERSHIP SO LONG AS HE IS A MEMBER OF THE FIRE COMPANY. (Emphasis in original.)

the company was because they understood that their insurance benefits were only 10% of the benefits paid to male Ambulance Corps members who were also members of the company.[2] The claimants understood that they were the only members out of the approximately seventeen members of the Ambulance Corps who were subject to the lower insurance benefits.

The company created an investigative committee, pursuant to the company's constitution, to review the complainants' applications, which the committee approved and signed. In accordance with the company's constitution, the committee's recommendation went before the members of the company who voted on the complainants' membership on November 1, 1988.

Shortly before the November vote, the complainants met with a reporter for the *Norristown Times Herald.* The paper ran a story about the complainants which appeared in the paper before the vote. In the story, Kenna is quoted as saying "My job wouldn't change just because I become a member of the firehouse ... I wouldn't want to go downstairs and be around the men smelling of beer." Kenna told the company president that she attempted to have a retraction printed because she claimed that she did not make the above statement.

On November 1, 1988, the members of the company blackballed Kenna and Carracappa–Waddell pursuant to the company's constitution. On December 6, 1988, the company also blackballed Brigandi and Hanna.

On January 12, 1989, Brigandi filed a complaint with the commission on behalf of herself and all similarly situated female Ambulance Corps volunteers (the 1989 complaint). The complainants agreed to drop the 1989 complaint in return for the company deleting the blackball provisions from the company's constitution.

**2.** The question of whether the complainants' insurance coverage is less than male members' coverage is not at issue here. The only issue in this appeal concerns the company's rejection of the complainants' applications for membership in the company.

The complainants reapplied for membership in the company in July of 1989 (the second application). As opposed to the complainants' first application which sought membership as contributing members, the second application indicated that the complainants' sought active-member status.

This time, a member of the company who was on the investigating committee for each of the complainants rejected each of their applications without stating any reason. Therefore, the company did not vote on the complainants' second application for membership.

However, the complainants reapplied for active membership in November, 1989 (the third application). The investigating committee recommended the complainants for membership, and 35 members of the company voted on the applications on December 5, 1989. However, the company voted not to admit the complainants as members. Kenna, Carracappa–Waddell and Hanna received 10 favorable votes and 25 unfavorable votes; Brigandi received 9 favorable and 26 unfavorable.

The complainants then filed a second complaint against the company with the commission in March 1990 (the 1990 complaint) alleging sex-based discrimination and retaliation by the company. The company filed an answer and the parties filed stipulations of fact. In addition, the company filed motions for the hearing examiner to recuse and to dismiss the 1990 complaint for reasons of improper commingling of prosecutorial and adjudicatory functions within the commission.

The hearing examiner issued an interlocutory order denying both of the company's motions. The hearing examiner heard testimony from September 30 to October 2, 1991, and again on August 31, 1992. The hearing examiner then closed the record and issued proposed findings of fact and conclusions of law, and a proposed opinion and order for the commission.

The hearing examiner concluded that the company violated § 5(a) and (d) of the Act, 43 P.S. § 955(a) and (d). Specifically, the hearing examiner concluded that the complainants proved the elements necessary to establish a prima facie case of sex-based discrimination by proving (1) that they are mem-

bers of a protected class, (2) that they applied for and were qualified for fire fighter positions, (3) that they were rejected, and (4) that "men with similar qualifications were accepted for membership."

In addition, the hearing examiner found that the complainants established a prima facie case of retaliation by proving (1) that they engaged in a protected activity (the 1989 complaint), (2) that the company was aware of the complainants' protected activity, (3) that the complainants' applications for membership were rejected, and (4) that there was a causal link between the complainants' protected activity and the company's rejection of the complainants' applications.

The hearing examiner then concluded that the company failed to meet its burden of production by failing to produce legitimate non-discriminatory reasons for rejecting the complainants. In addition, the hearing examiner made findings sufficient to conclude that the company's reasons for denying the complainants' applications were pretextual. Therefore, the hearing examiner recommended that the commission adopt the stipulations of fact filed by the parties, his findings of fact, conclusions of law and opinion. On December 1, 1992, the commission adopted the hearing examiner's record as its own.

Accordingly, the commission issued the following order:

1. That the Fire Company shall cease and desist from sex-based discrimination with regard to its application process.

2. That the Fire Company shall cease and desist from retaliation against any individual who either opposes a practice forbidden by the [the Act] or has made a charge under [the Act].

3. That within 30 days of the effective date of this Order, the Fire Company shall pay to Kenna the lump sum of $108.00, to Hanna the lump sum of $254.60, and to Carracappa–Waddell the lump sum $185.00, which amounts represent certifiable travel expenses and lost wages incurred as a result of these complaints.

4. That the Fire Company shall offer the Complainants immediate instatement as members of the Fire Company with all rights and privileges thereof, and with an effective date of December 5, 1989.

5. That the Fire Company shall take affirmative measures to recruit women as firefighters [sic].

6. That within 30 days of the effective date of this Order, the Respondent shall report to the [commission] on the manner of its compliance with the terms of this Order by letter, addressed to Pamela Darville, Esquire, in the [commission's] Philadelphia Regional Office.

PENNSYLVANIA HUMAN RELATIONS COMMISSION

/s/Robert Johnson Smith, Chairperson

ATTEST:

/s/Gregory J. Celia, Secretary

■ Now the company comes before this court and asks that we reverse the commission's order, or in the alternative, that we should vacate and remand the case for a new hearing. The company argues that the commission erred in finding that the complainants established a prima facie case of discrimination; that the hearing examiner improperly admitted and relied upon hearsay, opinion and irrelevant evidence; and that the company was denied due process because of the commissions' commingling of prosecutory and adjudicative functions. We note, however, that the company does not specifically address any part of this appeal to the commission's conclusion regarding retaliation. Our standard of review in decisions from the commission is limited to determining whether the commission violated constitutional rights, made findings of fact not supported by substantial evidence or committed an error of law. *Harmony Volunteer Fire Company and Relief Association v. Pennsylvania Human Relations Commission*, 73 Pa.Commonwealth Ct. 596, 459 A.2d 439 (1983).

## PRIMA FACIE CASE OF SEX–
## BASED DISCRIMINATION

■ The Pennsylvania Supreme Court set forth the requirements for discrimination claims in *Allegheny Housing Rehabilitation Corporation v. Pennsylvania Human Relations Commission,* 516 Pa. 124, 129, 532 A.2d 315, 318 (1987), as follows:

> In *McDonnell Douglas [Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)]*, the Court stated that the burden of establishing a prima facie case could be met by showing "(i) that [the plaintiff] belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of [the plaintiff's] qualifications." 411 U.S. at 802, 93 S.Ct. at 1824. This standard is, to be sure, adaptable to accommodate differences in the nature of the discrimination alleged (e.g., sex rather than race) and in the action alleged to be improper (e.g., discharge rather than refusal to hire). The form it takes, however, must be appropriate to its function, which is to "eliminate[ ] the most common nondiscriminatory reasons" for the employer's action. [*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).]

In our case, the company does not dispute that the complainants are women who applied for jobs for which they are qualified, but were nonetheless rejected. Instead, the company contends that there is no evidence in the record of the relative qualifications of "after-admitted" men. Rather, the record indicates that the company admitted approximately 30 men to the company in a three-year period after rejecting the complainants' applications. The company argues that the commission's conclusion that "men with similar qualifications were accepted for membership" merely establishes that men were admitted to the company after the complainants' applications were denied. However, if the after-admitted men were

better qualified than the complainants, then the company did not discriminate. Because the record is devoid of any evidence of the relative qualifications of the after-admitted men, the company insists that the claimants have failed to establish a prima facie case.

The company's constitution sets forth the application procedures and necessary qualifications for new members in Article X. The pertinent parts of Article X are as follows:

## ARTICLE X

### Proposition for Membership

Sec. 1. *Any person of good moral character, 18 years of age or over, shall be eligible to active, life or contributing membership, also honorary membership.*

Sec. 2. Proposition for membership must be in writing, Five Dollars accompanying the propositions, which is to be considered his admission fee if elected. If rejected as a candidate for admission, the initiation fee will be returned.

Sec. 3. A committee of three members shall be appointed by the President of the Company for each application for membership, whose duty it shall be to make strict inquiry as to the standing and qualification of the candidate proposed and report the result of their investigation in writing at the ensuing stated meeting.

If the report of the investigating committee be favorable, it shall be received and the candidate balloted on.

If the report of the investigating committee be unfavorable, the same shall be received and the committee discharged.

. . . .

Sec. 4. Election for members shall be by ballot, and if the majority of those voting approve the application the candidate shall be declared elected. *If rejected no valid reason shall be given.* (Emphasis added.)

The company has not provided any other evidence of necessary job qualifications. Therefore, the only criteria for mem-

bership are being over 18 and being of good moral character.[3] Neither party has suggested that we should consider the age requirement in our analysis. The company's suggestion is that the complainants must establish that they are at least as morally qualified as after-admitted men.

However, an inquiry into an applicant's moral character is a yes-or-no analysis. Unlike typing skills or years of experience, moral character cannot be summarized in an objective or quantifiable amount. An applicant is either of good moral character or they are of poor moral character. Furthermore, the Pennsylvania Supreme Court stated that "it is appropriate to the remedial purpose of the Act that the prima facie case not be an onerous one." *Id.* at 130, 532 A.2d at 319. We will not require the claimants to prove that their unquantified moral character is equal to the unquantified moral character of after-admitted men. Therefore, the fact that the complainants are morally qualified means that they are as qualified as after-admitted men, and the commission did not err in finding that the complainants established a prima facie case of discrimination.

## COMPANY'S BURDEN OF PRODUCTION

■ Discrimination cases have a shifting burden of proof. Once a prima facie case of discrimination is established by claimants, the employer, here the company, must provide legitimate, non-discriminatory reasons for its actions. The employer does not have to prove that it did not discriminate; it must merely present evidence that indicates that its actions were not discriminatory. The Pennsylvania Supreme Court in *Allegheny Housing* gave attention to the nature of the employer's burden of production.

If such evidence is presented, the question for the Commission is whether, on all (emphasis deleted) the evidence

---

**3.** These criteria are so basic that it is difficult *not* to meet the requirements. In fact, in the more than ninety years of the company's history, only two applicants have been denied membership besides the complainants. One was under 18 years of age and the other was arrested for arson. The record indicates that the arsonist was asked to remove his application for membership.

produced, the plaintiff has persuaded it by a preponderance of the evidence that the employer intentionally discriminated against her. Whether the plaintiff must eliminate a certain non-discriminatory reason as part of making a prima facie case or discredit the evidence of that same reason produced by the employer after plaintiff's prima facie case has been made, the result is the same; the plaintiff must persuade the factfinder by a preponderance of the evidence.

. . . .

If the plaintiff produces sufficient evidence that, if believed and otherwise unexplained, indicates that more likely than not discrimination has occurred, the defendant must be heard in response. *Absent a response, the "presumption" of discrimination arising from the plaintiff's prima facie case stands determinative of the factual issue of the case. In other words, if the employer rests without producing evidence, the plaintiff must prevail if he or she has produced sufficient evidence to make out a prima facie case. If, however, the defendant offers a non-discriminatory explanation for the dismissal, the presumption drops from the case.* As in any other civil litigation, the issue is joined, and the entire body of evidence produced by each side stands before the tribunal to be evaluated according to the preponderance standard ... Stated otherwise, once the defendant offers evidence from which the trier of fact could rationally conclude that the decision was not discriminatorily motivated, the trier of fact must then "decide which party's explanation of the employer's motivation it believes."

*Id.* at 130–131, 532 A.2d at 318–19 (emphasis added).

Therefore, once the complainants establish a prima facie case, the employer has the simple burden to produce evidence of legitimate, non-discriminatory reasons for its actions. If the employer does not produce such reasons, then the law presumes that the employer's actions are motivated by discriminatory intent.

However, the company suggests that the commission erred in concluding that the company discriminated because the

complainants did not prove that the reasons offered by the company members were pretextual. Rather, the company suggests, the commission's decision is based on statistics and "atmosphere," in addition to improper inferences from non-testifying company members, and what the company believes is peculiar vote counting by the commission.

We do not agree. The complainants must win this appeal because the company failed to meet its burden of production. In order to meet its burden of production, the company needs to show that the votes cast against the complainants' applications (the "no-votes") were cast for legitimate, non-discriminatory reasons. If a majority of members voted *against* the complainants for legitimate, non-discriminatory reasons, then the complainants were not subjected to discrimination despite the intentions of any other voting members.

In this case, 35 members voted on the complainants' applications, and 25 cast no-votes (26 in the case of Brigandi). Thus, 18 constitutes a majority vote. The commission found that 6 members cast no-votes for *non-legitimate* reasons, and that those votes could not be counted against the complainants. The company does not contest this finding. Therefore, we are limited to examining the remaining 19 no-votes. If 18 of the remaining 19 no-votes were cast for legitimate reasons, then the company did not discriminate against the claimants because the complainants lost by a legitimate majority vote.

However, the record contains testimony from only 16 of the remaining 19 no-voting members. Those 16 who testified produced legitimate, non-discriminatory reasons for their votes. Nevertheless, without testimony from at least 2 more no-voting members, we cannot determine whether a *majority* of the company's no-votes were cast for legitimate reasons.

In this case the complainants established a prima facie case, but the company has not produced evidence that a majority of its members voted "no" for legitimate, non-discriminatory reasons. Therefore, the company has not met its burden of production, and we must presume that its behavior is discriminatory. *Id.*

Thus, the commission did not commit an error in concluding that the company discriminated even though the complainants never called three members of the company to testify about the motivation for their votes. In this case, the burden is not the complainants', but the company's.

Accordingly, the company's contention that the commission's decision is based on statistics and "atmosphere" are not pertinent to our analysis. Those facts address the pretextual nature of the company's reasons for denying membership to the complainants. Because the company did not meet its burden of production, the complainants are not required to prove that the legitimate reasons for rejecting the applications are pretextual.

The company also seems to suggest that the complainants must lose unless the commission can find at least 18 votes *in favor of admitting* the complainants as members. Therefore, the company argues that the commission cannot assume that the 6 non-legitimate no-votes would have been "yes-votes." This argument is misguided. The company cannot prevail if it does not rebut the presumption of discrimination by producing evidence that the no-votes were cast for legitimate reasons.

Similarly, we need not address the company's argument that its members' reasons for voting against the complainants are legally sufficient reasons for denying membership. Whether or not the 16 testifying members who cast no-votes had legally sufficient reasons is only significant if the employer's burden of production is met and the complainants are attempting to prove that the reasons are pretextual.

## HEARSAY, OPINION, AND IRRELEVANT EVIDENCE

The company next argues that the commission improperly relied upon hearsay, lay opinion and irrelevant evidence in support of its findings of fact. Despite devoting 6 pages of its brief to this argument, the company has not directed us to any particular examples in the approximately 1,000 page record where the improper admission of evidence prejudiced the company's defense.

This court has stated before that "[w]e decline to become appellant's counsel. When issues are not properly raised and developed in briefs, when the briefs are wholly inadequate to present specific issues for review, a court will not consider the merits thereof." *Sudduth v. City of Pittsburgh*, 135 Pa. Commonwealth Ct. 392, 580 A.2d 929 (1990) (citing *Commonwealth v. Sanford*, 299 Pa.Superior Ct. 64, 445 A.2d 149 (1982)).

The company, in its statement of the case, mentions that it objected repeatedly and lists approximately 65 pages in the transcripts where it objected to testimony or evidence. However, the company does not attempt to show that any of the objected-to hearsay was relied upon by the commission. We cannot attempt to determine which objections might be of interest to the company. Therefore, we will not consider this argument.

## VIOLATION OF DUE PROCESS THROUGH COMMINGLING OF PROSECUTORY AND ADJUDICATORY FUNCTIONS

■ Finally, we must address the company's suggestion that the Act mandates unconstitutional commingling of prosecutorial and adjudicatory functions. The company contends that the Act and its regulations require the commission to determine whether or not probable cause exists, and to act as the ultimate fact finder. Therefore, under the Pennsylvania Supreme Court decision, *Lyness v. State Board of Medicine*, 529 Pa. 535, 605 A.2d 1204 (1992), the company argues, the commission has improperly commingled its prosecutory and adjudicatory functions, and deprived the company of its right to due process.

However, we note that *Lyness* does not require a complete separation of powers within state agencies. The Supreme Court commented about the unlikeliness of complete separation of functions:

[I]n the modern world of sprawling governmental entities akin to corporations it would be both unrealistic and counterproductive to insist that administrative agencies be for-

bidden from handling both prosecutorial and adjudicatory functions, where such roles are parcelled out and divided among distinct departments or boards ...

What our Constitution requires, however, is that if more than one function is reposed in a single administrative entity, walls of division be constructed which eliminate the threat or appearance of bias.

*Id.* at 546, 605 A.2d at 1209. In addition, the Supreme Court concluded its decision by noting that, although the State Board of Medicine commingled functions, the solution to the unconstitutional procedure was relatively simple:

As in [*Dussia v. Barger,* 466 Pa. 152, 351 A.2d 667 (1975) ], we do not here declare any statute enacted by the legislature unconstitutional. Dussia, 466 Pa. at 166, 351 A.2d at 675. *Rather, the fatal defect here lies in the administrative regulations, and the loose interpretation afforded those regulations by the [State Board of Medicine]; which defect can be readily cured by placing the prosecutorial functions in a group of individuals, or entity, distinct from the Board which renders the ultimate adjudication.*

*Id.* 529 Pa. at 549, 605 A.2d at 1211 (emphasis added).

Therefore, if the commission has adequately separated its functions from each other by regulations enacted under the Act, then the company here will have received its guaranteed due process. We conclude that the commission did not commingle its functions because the regulations require the *commissioners* to make final adjudications whereas the *commission's staff* finds probable cause.

The company's argument is founded on particular language in the Act and its related regulations. Initially, the company notes that the Act states that " 'Commission' means the Pennsylvania Human Relations Commission," and that the commission is comprised of eleven members appointed by the Governor. § 6 of the Act, 43 P.S. § 956. In addition, the company notes several cases in its brief that stand for the proposition that the commission is the ultimate fact finder.

Then the company calls our attention to § 9 of the Act, 43 P.S. § 959(d), which contains the following language:

In the case of failure so to eliminate such practice or in advance thereof, if in the judgment of the Commission circumstances so warrant, the Commission shall cause to be issued ... a written notice [to the respondent] ... to answer the charges of such complaint at a hearing before the Commission at a time and place to be specified...."

Finally, the company suggests that the regulations, at 16 Pa.Code § 42.71, state that the commission determines whether probable cause exists. The exact language is as follows:

(a) If, after a preliminary investigation, the Commission determines that probable cause exists to credit the allegations of the complaint, a finding of probable cause will be made.

(b) If a finding of probable cause is made, the Commission will endeavor to eliminate the unlawful discriminatory practice by conference, conciliation and persuasion

The company argues that the statutory and regulatory language quoted above, and case law establishing the commission's role as the ultimate fact finder, indicate that the commission plays an active role at every step of the cases in its jurisdiction.

However, the company has misinterpreted the meaning of the regulations promulgated under the Act. When § 42.71 is read in light of the entire regulation, we must conclude that § 42.71 refers to the *commission's staff* and not the commissioners. The pertinent sections of the regulation are as follows:

### § 42.3. Definitions.

(a) The following words and terms, when used in 1 Pa. Code Part II ... or in this chapter, have the following meanings, unless the context clearly indicates otherwise:

. . . .

(4) Commission—The Human Relations Commission of the Commonwealth, its Commissioners, *staff* and counsel.

. . . .

(11) Staff—The term includes, but is not limited to, the Executive Director and Deputy Directors, Regional Directors and other personnel as the Commission may appoint. *Duties of the staff include, but are not limited to, receiving, initiating, amending, processing, serving and investigating formal and informal complaints; conducting conferences, conciliations* and other meetings the regulations and the applicable statutes provide; conducting other investigations the applicable statutes provide; *determining whether or not probable cause exists to credit the allegations of the complaint;* and advising and educating the public and issuing publication, notices, recommendations and guidelines to effectuate the policies and purposes of the applicable statutes.

(12) Staff counsel—The staff of attorneys designated by the Commission to give legal assistance to complainants appearing before the Commission. The term does not include the permanent hearing examiners and other attorneys designated by the Commission to render legal advice to Commissioners on complaints before the Commissioners for public hearing.

. . . .

## § 42.41. Initiation of investigation.

(a) Upon filing of a complaint or whenever there is reason to believe that an unlawful discriminatory practice has been committed, the *Commission staff will make a prompt investigation in connection therewith.*

(b) Investigations conducted by the Commission prior to the approval of a public hearing on the merits of a complaint will be conducted by the Commission staff. . . .

## § 42.61. Dismissal of complaints.

(a) If, after investigation, *the staff determines that no probable cause exists* to credit the allegations of the complaint ... *the staff shall make a finding reflecting that determination.*

16 Pa.Code §§ 42.3–42.61 (emphasis added). The meaning of these regulations is that "commission" can also mean "commission staff", which is the body vested with the responsibility for determining whether probable cause exists and with conducting conferences and conciliation meetings. The company misinterpreted the regulations because it uniformly interpreted "commission" to mean only the commissioners.

The literal meaning of the combined language of § 42.71(a), which the company relies upon ("[i]f ... the Commission determines that probable cause exists ..."), and § 42.61(a) ("[i]f ... the staff determines that no probable cause exists ..."), requires the unlikely practice of the commissioners making findings of the *existence* of probable cause and the staff making findings of the *absence* of probable cause. Rather, § 42.71 merely creates the procedural mechanism for the staff to institute its powers granted under § 42.3(a)(11). Subparagraphs (a) and (b) of § 42.71, which discuss finding probable cause and conducting conferences and conciliation meetings, respectively, are both duties specifically delegated to the staff under § 42.3(a)(11). Therefore, the commissioners do not play any role in finding probable cause or in prosecuting complaints under the regulations.

Nonetheless, the company argues that the language of the Act must be our guide in determining whether the commission has commingled its functions. According to the company, the Act requires the commission, i.e., the commissioners, to investigate, prosecute and decide complaints of sex-based discrimination. The company believes that the regulations cannot remedy facially unconstitutional legislation because the regulations must, *a fortiori*, be beyond the scope of the Act and, therefore, invalid.

However, as we quoted above, if a commingling problem exists, the Pennsylvania Supreme Court indicated that it may be cured through regulatory amendments. Nonetheless, we find nothing in these regulations outside of the scope of the Act.

Therefore, we conclude that there is no commingling of functions within the commission and that the company received adequate due process.

## SUNSHINE ACT

■ Finally, the company argues that sections 5 and 6 of the Sunshine Act, Act of July 3, 1986, P.L. 388, 65 P.S. §§ 275, 276, impose upon the commission an "affirmative duty to demonstrate" (1) that each commissioner reviewed the entire record before making determinations of fact, and (2) that a majority of the commission voted in favor of its decision. The company contends that the commission failed to adhere to these requirements of the Sunshine Act, and therefore the decision must be reversed.

However, the Sunshine Act does not impose the above affirmative duties. Rather, the Sunshine Act requires the commission to keep a record of its official actions. The minutes of open meetings must include the substance of official actions and a record of roll call votes taken by the commission. Nonetheless, the Sunshine Act does not impose an affirmative duty on the commission to provide proof of its compliance.

The company recognizes that an improper vote by the commissioners would be apparent from a review of the minutes, but the company mistakenly believes that the commission must provide the minutes and proof that it has complied with the Sunshine Act. On the contrary, the company bears the burden of providing us with evidence of alleged wrongdoings. Instead, the company has not supplied us with any evidence to support these contentions.

■ In addition, the commission's order expressly refutes the company's suggestion that the commission did not review the entire record. The order states that the commission approved the stipulations of fact, findings of fact, conclusions of law and opinion of the hearing examiner, "after a review of the entire record". Therefore, because the company has not supplied any contrary evidence to suggest that the commission

did not review the entire record, we must presume that the commission acted properly. *Mishler v. Department of Transportation*, 102 Pa.Commonwealth Ct. 618, 519 A.2d 565 (1985).

■ Also, nothing in the record indicates that the commission's order was not supported by a proper vote. The commission's order, signed by the chair and attested by the secretary, as is customary, bears no import of any dissent and thus indicates that the commission unanimously supported the decision and order.

Without any evidence from the company to support its Sunshine Act argument, we must conclude that the commission complied with that law.

## CONCLUSION

Accordingly, the commission did not err in concluding that the complainants established a prima facie case of discrimination, and in concluding that the company did not meet its burden of production. Furthermore, we conclude that the commission did not commingle its prosecutory and adjudicatory functions. Therefore, we affirm the decision and order of the commission.

## *ORDER*

NOW, March 10, 1994, the order of the Human Relations Commission, dated December 1, 1992, at docket Nos. E–50698–D, E–50699–D, E–50700–D and E–50701–D, is affirmed.