**In Re: Petition to AUDIT CAMPAIGN FINANCE REPORTS OF Jerry CARTWRIGHT, Jr.**

**Appeal of: Nicholas Risko, William Wilson, Robert Jackson Jr., Helen Jackson, Jeffrey Steffler, Kenneth R. Wallace and Jean Wallace.**

Commonwealth Court of Pennsylvania.

Argued May 8, 2006.
Decided June 1, 2006.

Gabriel P. Cilli, New Castle, for appellants.

Ryan C. Long, Ellwood City, for appellee.

BEFORE: McGINLEY, Judge, and PELLEGRINI, Judge, and KELLEY, Senior Judge.

OPINION BY Judge PELLEGRINI.

Nicholas Risko, William Wilson, Robert Jackson Jr., Helen Jackson, Jeffrey Steffler, Kenneth R. Wallace and Jean Wallace, registered electors in Lawrence County (collectively referred to as "Electors"), appeal from an order of the Court of Common Pleas of Lawrence County (trial court) dismissing their Petition to Audit Campaign Finance Reports of Jerry Cartwright, Jr. (Cartwright) because Cartwright had not substantially or willfully violated any provision of the Election Code (Election Code)[1] when he omitted expenses for 38 campaign advertisements from his campaign finance reports during the relevant reporting periods.

Cartwright was a candidate for Magisterial District Judge for District No. 53–3–01 in Lawrence County. Section 1626(a) of the Election Code, 25 P.S. § 3246(a),[2] requires all candidates to file a report of

---

1. Act of June 3, 1937, P.L. 1333, *as amended,* 25 P.S. §§ 2600–3591.

2. Section 1626(a) of the Election Code provides:

   Each ... candidate for election to public office shall file with the appropriate supervisor reports of receipt and expenditures on forms, designed by the Secretary of the Commonwealth, if the amount received or expended or liabilities incurred shall exceed the sum of two hundred fifty dollars ($250). Should such an amount not exceed two hundred fifty dollars ($250), then the candidate ... shall file a sworn statement to that effect with the appropriate supervisor rather than the report required by this section.

receipts and expenditures if the amount a candidate expends exceeds $250. Among other things, the report must include every campaign expenditure and any unpaid debts and liabilities.[3] As well as a post-election report,[4] candidates are required to file two pre-election reports[5]—the first, no later than the sixth Tuesday before the election listing receipts and expenses received and incurred 50 days before the election, and a second pre-election report filed by the second Friday before the election with receipts and expenses received and incurred up to 15 days prior to the election.

As part of his campaign, Cartwright ran 38 political advertisements in the Ellwood City Ledger (Ledger) from April 19, 2005, to May 26, 2005. On May 4, 2005, Cartwright filed his pre-election campaign finance report for the January 1, 2005 through May 2, 2005 reporting period during which 21 of his advertisements appeared and filed his post-election campaign finance report on June 15, 2005, for the May 3, 2005 through June 6, 2005 report-

ing period during which the other 17 advertisements appeared. However, Cartwright omitted the expenses incurred for all 38 advertisements from those reports.

As a result of this omission, Electors petitioned for the audit of Cartwright's pre-and post-election campaign finance reports contending that (1) he failed to disclose expenses for 38 campaign advertisements in his reports in violation of Sections 1626(b)(4) and (5) of the Election Code; (2) he harmed the general public and Electors by contravening the plain intent of the Election Code requiring candidates to make full public disclosure of their campaign finances;[6] and (3) he received preferential treatment from the Ledger in violation of Section 1633 of the Election Code, 25 P.S. § 3253,[7] by knowingly receiving a contribution of discounted advertisements that was not extended to the general public or all candidates equally. Electors contend that these alleged violations of the Election Code were substantial and willful requiring cer-

---

**3.** Sections 1626(b)(4) and (5) of the Election Code provide:

> (b) Each report shall include the following information:
>
> * * *
>
> (4) Each and every expenditure, the date made, the full name and address of the person to whom made and the purpose for which such expenditure was made.
>
> (5) Any unpaid debts and liabilities, with the nature and amount of each, the date incurred and the full name and address of the person owed.

**4.** See Section 1626(e) of the Election Code, 25 P.S. § 3246(e).

**5.** See Section 1626(d) of the Election Code, 25 P.S. § 3246(d).

**6.** See Hamilton v. Hennessey, 783 A.2d 852 (Pa.Cmwlth.2001).

**7.** Section 1633(a) of the Election Code provides:

> It is unlawful for any National or State bank, or any corporation, incorporated under the laws of this or any other state or any foreign country or any unincorporated association, except those corporations formed primarily for political purposes or as a political committee, to make a contribution or expenditure in connection with the election of any candidate or for any political purpose whatever except in connection with any question to be voted on by the electors of this Commonwealth. Furthermore, it shall be unlawful for any candidate, political committee, or other person to knowingly accept or receive any contribution prohibited by this section, or for any officer or any director of any corporation, bank, or any unincorporated association to consent to any contribution or expenditure by the corporation, bank or unincorporated association, as the case may be, prohibited by this section.

tification to the county district attorney for the institution of criminal proceedings pursuant to Section 1636(b) of the Election Code, 25 P.S. § 3256(b).[8]

At the hearing for the audit petition, Electors presented the testimony of Mary Rueckl (Rueckl), the business manager for the Ledger. She testified that Cartwright ran 38 political advertisements in the Ledger during his campaign for district justice at a cost of $155 per month. As to how the rate was set, Rueckl testified that a triple header advertisement cost new customers $225 per month, but was reduced to $155 per month for both new customers who signed a 12–month agreement or existing creditworthy customers. Because Cartwright was an existing creditworthy customer as he ran legal notices with the Ledger, she testified that a 12–month agreement was not required for him to receive the $155 price. Rueckl went on to testify that Cartwright never requested any discount, forbearance or postponement of charges, or contribution of free advertising space. She also stated that she never offered him a discount or reduced rate and charged him the normal and usual amount for his particular advertisements. Rueckl testified that Cartwright's credit card was placed in a specific box for customer credit cards, and receipt of such card was considered prepayment. She stated that customer accounts were billed when all advertising for that customer was finished, and Cartwright's credit card was processed on June 1, 2005, for all 38 advertisements. Rueckl testified that four other political candidates also used a credit card for payment purposes.

Electors then presented the testimony of Scott Kegel (Kegel), the general manager for the Ledger and Cartwright's brother-in-law. He testified that he helped Cartwright plan his advertising and provided him with some prices, but never advised him of any 12–month agreement for the $155 price because, for the past 10 years, the Ledger had not required this agreement for creditworthy customers. Kegel testified that Cartwright left the style and makeup of the advertisements to his discretion, and Cartwright had no knowledge of the specific charges he incurred but knew he had an obligation to the Ledger. Kegel stated that Cartwright later indicated that he had not received a bill, and Kegel learned that the Ledger did not send out bills for accounts with a zero balance, which included Cartwright's account because he paid by credit card. He also stated that he provided Cartwright with advice on his campaign, but never gave him any contribution, discount or free advertising and Cartwright never asked for any forbearance or postponement of charges.

Electors next presented Cartwright's testimony. He testified that he met with Dominick Viccari (Viccari), the promotions manager for the Ledger, and requested him to put together an effective campaign for a reasonable price. Cartwright testified that he gave his credit card to the Ledger's business office that day. He stated that his May 4, 2005, and June 15, 2005 campaign finance reports did not include expenses for advertising in the Ledger as either an obligation unpaid or

---

8. Section 1636(b) of the Election Code provides:

> If the court shall decide upon the audit that any person, whether a candidate or not, has accepted contributions or incurred expenses or has expended or disbursed money in contravention of this act, or has other-

wise violated any of the provisions of this act, it shall certify its decision to the appropriate prosecutorial ·officer and it shall thereupon be the duty of such officer to institute criminal proceedings as he or she shall deem necessary.

expense paid because he was not provided any information regarding his financial obligation prior to receiving his credit card statement around June 21, 2005. Cartwright testified that he intended to file these advertising expenses on his next campaign finance report, but instead filed a supplemental report to his second campaign finance report when Electors filed their petition for audit on August 23, 2005.

Testifying on his own behalf, Cartwright stated that when he briefly met with Viccari to discuss a political advertising campaign, he was shown various fliers with different packages. He stated that Viccari told him part of the cost included putting the advertisements together. Cartwright testified that he talked to Kegel many times about advertising and provided him with his personal information relative to his qualifications for district judge. He stated that he never asked for nor was offered any partial treatment, contribution, discounted or reduced rate, or forbearance or postponement of charges. Cartwright testified that in late May he requested a bill from Kegel, but never received a bill or invoice and was unaware that he was being charged $155 for a particular advertisement. He testified that upon receiving his credit card statement, which showed one transaction from the Ledger totaling $1,632.92, he paid his balance by personal check.

Cartwright next presented Viccari, who testified that Cartwright requested to be included on the political calendar,[9] filled out a coupon with either a $55 or $65 price if he cross-filed, and turned his credit card over to the business office. Viccari stated that Cartwright wanted to be charged when all the advertising was finished and had no idea what advertisements were going to be run. He further provided that Cartwright was not told to sign a 12–month agreement because he was trusted by the Ledger. Viccari stated that Cartwright received the normal and customary charges for political advertisements. He also testified that Cartwright never asked for nor did anyone request him to provide Cartwright with any discounted rate, postponement of payment or contribution of advertising space.

Finding the testimonies of Rueckl, Kegel, Cartwright and Viccari to be credible in establishing that any omission in Cartwright's campaign finance reports was a *de minimis* infraction; any reporting violation was not a willful violation of the Election Code; the public was not harmed; and Cartwright did not request the Ledger to contribute to his political campaign, provide free or discounted advertising space, or provide partial treatment, the trial court dismissed Electors' audit petition. This appeal followed.[10]

On appeal, Electors initially contend that the trial court erred in determining that Cartwright's violation of the Election Code was *de minimis*, rather than substantial or willful, when he omitted from his May 4, 2005, and June 15, 2005 campaign finance reports his expenses for 38 advertisements published in the Ledger. They argue that his costs constituted one-third of his total expenses in the relevant reporting period, he knew the advertise-

9. A political calendar is a paid listing of all the candidates running for public office who want to be included on the list. (Reproduced Record at 281a.)

10. Our scope of review is limited to an examination of the record to determine whether the trial court committed errors of law and whether the trial court's findings were supported by adequate evidence. *In re Audit of Campaign Expenses, Statements, Election Reports, and Affidavits Required to be Filed with the Northampton County Election Board*, 747 A.2d 1262 (Pa.Cmwlth.2000).

ments were running, he was made aware of the typical costs, he filled out a coupon that listed the expense for running one advertisement, and he did not obtain an invoice or balance owed for the advertisements.

■ The Election Code reporting requirements carry out the evident legislative intent that expense accounts of candidates for public office be subject to the closest scrutiny. *Appeal of Angle,* 162 Pa. Cmwlth. 430, 639 A.2d 875 (1994). In *Commonwealth v. Beck,* 810 A.2d 736 (Pa. Cmwlth.2002), we explained:

> The importance of campaign reporting requirements is obvious: by preserving public access to the manner in which campaign money is received and spent, public confidence in the election process is maintained. [Candidate's] willful refusal to comply with the registration and reporting requirements prevents verification of campaign receipts and expenses, thereby imperiling confidence in the election. This is the mischief the Legislature sought to avoid. Accordingly, we discern no abuse of discretion from the trial court's refusal to dismiss the charges as *de minimis.*

*Id.* at 746.

■ An audit is the enforcement mechanism used to carry out that intent. *Brunwasser v. Fields,* 487 Pa. 283, 409 A.2d 352 (1979). If a trial court determines upon reviewing the audit that any person has accepted contributions, incurred expenses, expended or disbursed money in contravention of the Election Code or otherwise violated any provision of the Election Code, the trial court shall certify its decision to the appropriate prosecutorial officer who shall institute criminal proceedings as deemed necessary.[11] If

a candidate is found by any court of this Commonwealth in criminal proceedings to have willfully accepted contributions or made any expenditure in contravention of the Election Code, the candidate may be subject to such penalties as forfeiture of office.[12] However, "[i]t can fairly be said that the legislature did not intend all violations—e.g., minor or trivial infractions—of the Election Code to be the basis for such harsh penalties as forfeiture of office or criminal prosecutions." *Brunwasser,* 487 Pa. at 291–92, 409 A.2d at 356.

■ In this case, there is no doubt that Cartwright's election reports were deficient under Sections 1626(b)(4) and (5) of the Election Code even though the amount spent for the 38 advertisements placed in the Ledger were not invoiced until after the election. The timing of an invoice cannot be determinative of when an expenditure has to be reported in a pre-election report because it would frustrate the intent of the Election Code reporting requirements to let the public know how a campaign was spending its money before the election. In re Audit of Campaign Expenses. Because Cartwright failed to report the violation, the question here is whether that violation was so substantial requiring referral to the district attorney for prosecution.

■ Electors urge us to find that it was a substantial violation because the amount spent on these advertisements was approximately one-third of the amount Cartwright expended on his entire campaign, and the public was harmed by the omission of advertising expenses from Cartwright's campaign finance reports because it was prevented from scrutinizing all his campaign finances. While the amount is a

---

11. *See* Section 1636(b) of the Election Code, 25 P.S. § 3256(b).

12. *See* Section 1637 of the Election Code, 25 P.S. § 3257.

factor and the harm to the public in not disclosing the disputed expenditures or receipts is important as it imperils the confidence in the election, other factors such as the type of omission(s), the number of omission(s) and, most importantly, the intent behind the omission(s) must be taken into consideration in determining whether a violation is substantial.

Applying those factors, the trial court properly found that the violation was not substantial based on its factual findings that Cartwright's election reports were otherwise complete and timely, there was no intent to hide the expenditure in that he attempted to obtain a bill or invoice from the Ledger to include the advertising expense in his next campaign finance report, and he filed a supplemental campaign finance report to rectify the omission. Moreover, the absence of the costs of those ads in the election reports would not imperil the public's confidence in the election because the public was aware that Cartwright expended funds to place them in the Ledger whether they were listed on the report or not. Based on those findings, the trial court did not err in determining that the interest of the general public was protected and the intent of the electorate fulfilled, and Cartwright's omission of advertising expenses in his pre-and post-election campaign finance reports during the relevant reporting periods was not a substantial violation of the Election Code.

■ Electors also contend that the trial court erred in finding that Cartwright did not receive preferential treatment when he knowingly received a contribution from the Ledger through a discounted price on the triple header advertisement without having to sign a 12–month agreement because that opportunity was not made available to the general public or all candidates equally. The term "contribution" means "any payment, gift, subscription, assessment, contract, payment of services, dues, loan, forbearance, advance or deposit of money or any valuable thing,[13] to a candidate ... made for the purpose of influencing any election in this Commonwealth" and shall also include "the granting of discounts or rebates not available to the general public; or the granting of discounts or rebates by ... newspapers not extended on an equal basis to all candidates for the same office." *See* Section 1621(b) of the Election Code, 25 P.S. § 3241(b). Because the Ledger is a corporation, if the discount is considered a contribution, it was improper under Section 1633(a) of the Election Code, 25 P.S. § 3253(a),[14] which makes it unlawful for

---

**13.** Section 1621(k) of the Election Code, 25 P.S. § 3241(k), provides:

> The words "valuable thing" shall mean all securities, goods, facilities, equipment, supplies, personnel, advertising, services, membership lists commonly offered or used commercially or other in-kind contributions provided without compensation, or at compensation which is below the usual and normal compensation for the items. The dollar value of a contribution of a valuable thing is the difference between the usual and normal charge for goods or services at the time of the contribution and the amount charged the candidate or political committee.

**14.** Section 1633(a) of the Election Code provides:

> It is unlawful for any National or State bank, or any corporation, incorporated under the laws of this or any other state or any foreign country or any unincorporated association, except those corporations formed primarily for political purposes or as a political committee, to make a contribution or expenditure in connection with the election of any candidate or for any political purpose whatever except in connection with any question to be voted on by the electors of this Commonwealth. Furthermore, it shall be unlawful for any candidate, political committee, or other person to knowingly accept or receive any contri-

any candidate to knowingly accept or receive any contribution from any corporation.

Here, there is no evidence whatsoever that the rate he received was less than the going rate. Rueckl, Kegel and Viccari all testified that the standard practice of the Ledger was not to require creditworthy customers, like Cartwright, to sign a 12–month agreement in order to receive the $155 price for the triple header advertisement. Specifically, Viccari testified that Cartwright received the normal and customary charges for political advertisements. Because the evidence of record clearly established that the Ledger regularly charged creditworthy customers $155 for the triple header advertisement without requiring a 12–month agreement, and the total charges for Cartwright's campaign advertisements were the usual and normal charges for the types and number of advertisements, the trial court did not err in determining that Cartwright did not receive partial treatment.

Accordingly, the decision of the trial court is affirmed.

### *ORDER*

AND NOW, this *1st* day of *June,* 2006, the order of the Court of Common Pleas of Lawrence County at No. 70144, dated October 17, 2005, is affirmed.

CONCURRING OPINION BY Senior Judge KELLEY.

I concur in the majority's decision in this matter but write separately with respect to the point raised on page 11 of the majority opinion. Section 1638 of the Election Code[1] requires that campaign advertise-

ments, including newspaper advertisements, disclose the identity of the person or committee which has paid for and authorized the advertisements. As pointed out by the majority, "the absence of the costs of those ads in the election reports would not imperil the public's confidence in the election because the public was aware that Cartwright expended funds to place them in the Ledger whether they were listed on the report or not." Majority Opinion at 11. Therefore, due to the specific requirements of the Election Code regarding advertisements, I believe that the foregoing alone is sufficient to find that Cartwright's oversight in omitting the incurred advertising expenses in his pre-and post-election campaign finance reports was not a violation of the Election Code.

1. Act of June 3, 1937, P.L. 1333, *as amended,* 25 P.S. § 3258.